# IN THE UNTED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALICIA COR CASANOVA,       )
                           )
       Plaintiff,       )
                           )      No. 13 C 0676
vs.                        )
                           )      Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,[1]   )
                           )
       Defendant.     )
                           )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Alicia Casanova seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") (doc. # 22). The Commissioner opposes the motion and seeks affirmance of the decision denying benefits (doc. # 23). For the following reasons, we deny Ms. Casanova's motion and affirm the Commissioner's decision.

### I.

We begin with the procedural history of the case. On January 13, 2010, Ms. Casanova filed a Title II application for DIB, alleging disability beginning December 1, 2004. The claim was denied on July 27, 2010 and again upon reconsideration on October 7, 2010. Sections 216(i) and 223 of the Social Security Act require a claimant to establish disability on or before the date

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin for Michael J. Astrue as the named defendant.

[2]On March 22, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 13).

through which she was last insured. The relevant period for this case begins with the alleged onset date, December 1, 2004, and continues through Ms. Casanova's date last insured ("DLI"), which was December 31, 2008. Thus, it was incumbent upon Ms. Casanova to prove her disability on or before that date (R. 31). Ms. Casanova requested, and was granted, a hearing before an administrative law judge ("ALJ"). Ms. Casanova appeared and testified along with a vocational expert before ALJ Victoria A. Ferrer on November 4, 2011 (R. 46-91). The ALJ issued an opinion denying DIB on November 22, 2011 (R. 31-39). The Appeals Council then denied Ms. Casanova's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-5). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We next provide a summary of the administrative record. Part A sets forth Ms. Casanova's background. Part B provides a review of her medical history during the relevant period (December 1, 2004 – December 31, 2008), followed in Part C by a discussion of Ms. Casanova's testimony during the hearing in front of the ALJ. Part D follows with a brief explanation of the Vocational Expert's testimony. Finally, Part E summarizes the ALJ's opinion.

## A.

Ms. Casanova was born on June 15, 1952 (R. 159). She is not married and lived with her sister in a two-story home during the relevant period (R. 60-62). She has an eleventh grade education (R. 192). She attended classes for six months toward her GED during the relevant period, but did not complete the program (R. 70). Ms. Casanova worked as a production supervisor for a chemical company until she was laid off in September 2004 when the company downsized its workforce (R. 49-54). After she was laid-off, Ms. Casanova continued to search for work, but was unsuccessful in finding comparable employment (R. 55-56). She worked for a

short while as a Spanish language interpreter at a school (*Id.*). She is currently unemployed, although she receives SSI benefits (R. 74-76).[3] She rarely drives, but is able to do so when necessary (R. 60).

**B.**

The relevant medical record begins in August 2004, when Ms. Casanova visited Susan Kim, M.D., with a complaint of knee pain (R. 294). Dr. Kim examined Ms. Casanova and ordered X-rays which revealed "minor arthritic changes in the right knee" (R. 313). Dr. Kim referred Ms. Casanova to Kevin Walsh, M.D., an orthopedic specialist, who saw her on September 13, 2004 (R. 330). Dr. Walsh ordered a set of standing X-rays of both knees and diagnosed Ms. Casanova with "moderately severe osteoarthritis" in both knees, but opined that arthroscopic intervention would not be helpful (*Id.*). Instead, Dr. Walsh injected both knees with a corticosteroid and recommended that Ms. Casanova continue to use ice and Vioxx to control the pain (*Id.*). Dr. Walsh instructed Ms. Casanova to return after one month if she continued to be symptomatic (*Id.*). The record does not indicate that Ms. Casanova returned to see Dr. Walsh for any follow up visits.[4]

In November 2004, Ms. Casanova was involved in a car accident where she reported that she was standing behind a parked car when it was struck by another car, causing her to fall to the ground (R. 282). Consequently, she returned to Dr. Kim complaining of back pain (*Id.*). After examining Ms. Casanova, Dr. Kim referred her to physical therapy, which she attended five times between December 2004 and January 2005 (R. 280). The physical therapist, Sue Miller,

---

[3] By an agency determination made on July 27, 2010, Ms. Casanova was awarded those benefits effective January 11, 2010. That decision was not before the ALJ, and is not before this Court.

[4] Dr. Walsh did certify an application for a disability parking placard that was dated April 13, 2006 (R. 460–61). However, there is nothing in the record indicating that Ms. Casanova saw Dr. Walsh after the September 2004 visit.

3

noted a subjective improvement of 50 percent over the course of treatment and a "fair" prognosis, provided Ms. Casanova complied with her home exercise program ("HEP") (*Id.*). The therapist further noted that Ms. Casanova reported a 0/10 pain rating when standing upright, but that her pain increased to 9/10 when bending to lift an object from the floor (*Id.*). The therapist opined that if Ms. Casanova continued the HEP, she would see continued improvement (R. 285). However, the therapist also commented that Ms. Casanova's compliance with her HEP was "poor" (*Id.*).

Ms. Casanova returned to Dr. Kim in September 2005 complaining again of back pain (R. 274). Dr. Kim completed an examination, ordered an MRI, and again referred Ms. Casanova to an orthopedic specialist (R. 273). The MRI indicated mild central canal stenosis, mild degenerative disc disease, and mild to moderate neural foraminal stenosis (R. 310). Nicholas Mataragas, M.D., the orthopedic specialist, saw Ms. Casanova on November 30 2005; he recommended a series of epidural steroid injections to alleviate her pain, but did not recommend surgery (R. 319–29). Dr. Mataragas instructed Ms. Casanova to return after the injection therapy was complete if she continued to have pain (R. 329). In the patient intake survey for Dr. Mataragas, Ms. Casanova reported that she did have some neck, shoulder, and right hand pain; however, she stated that the pain was "not bad" (R. 325). The record does not indicate that Ms. Casanova ever returned to see Dr. Mataragas.

In October 2005, Ms. Casanova visited Heidee Kalmar, D.P.M., complaining of pain after she stubbed her toe (R. 318). Ms. Casanova informed Dr. Kalmar that she was diabetic, and the doctor explained the importance of proper foot care in light of this condition (*Id.*). Dr. Kalmar concluded that Ms. Casanova's risk for diabetic complications affecting the feet was "very low" (*Id.*).

The record does not contain any additional medical records reflecting treatment received between October 2005 and her DLI, December 31, 2008.[5] The next medical consultation that appears in the record took place in February 2010, when Ms. Casanova reported that she began to experience back pain after falling in the shower in October 2009 (R. 447-49). Cary R. Templin, M.D., an orthopedic specialist, noted that Ms. Casanova reported that her back injury that had preceded the more recent fall had healed (*Id.*).[6] Ms. Casanova provided Dr. Templin with X-rays and an MRI taken in Mexico in October 2009 (*Id.*; R. 456). On her "New Patient Questionnaire" for Dr. Templin, Ms. Casanova indicated that she lives alone and that she is "retired" (R. 452). Ms. Casanova has since seen Paul A. Sauer, M.D., Jason T. Franklin, D.O., and Eugene C. Kuo, M.D., with complaints of back and leg pain; however, their records do not refer to Ms. Casanova's conditions during the period before the DLI of December 31, 2008 (R. 356-66; R. 427-31).

In July 2010, Francis Vincent, M.D., evaluated Ms. Casanova's current medical condition based on all of her medical records (R. 403-13). Dr. Vincent completed an Illinois Request for Medical Advice and a Physical Residual Functional Capacity ("RFC") Assessment (*Id.*). In his evaluation, Dr. Vincent concluded that there was insufficient evidence by which to evaluate whether Ms. Casanova was eligible for DIB prior to the DLI (R. 405). Dr. Vincent noted the absence of Medical Source Statements in the record describing limitations, and commented that Ms. Casanova's statements regarding the extent of her limitations were not consistent with the

---

[5] In a telephone interview with a Social Security Administration agent, Ms. Casanova reported that she received treatment beginning in 2006 from Stephen C. Whitmore, but the record does not contain any reference to this practitioner (R. 196).

[6] Dr. Templin's examination notes indicate that Ms. Casanova was referred by Helen Kuehlman, M.D. (R. 449), but the record does not contain any documents from Ms. Casanova's visit to Dr. Kuehlman. However, Ms. Casanova's prescription medicine record does show that Dr. Kuehlman prescribed a number of medications beginning in February 2010 (R. 467-69).

objective medical evidence for the period prior to December 31, 2008 (R. 413). Following Dr. Vincent's evaluation, Ms. Casanova submitted additional medical records, which were then reviewed by Frank Jimenez, M.D. Dr. Jimenez affirmed Dr. Vincent's findings, concluding that there was no additional medical evidence addressing Ms. Casanova's limitations prior to the DLI (R. 439-41).

## C.

On November 4, 2011, the ALJ held a hearing attended by Ms. Casanova, her counsel and a vocational expert, during which the ALJ posed questions to clarify Ms. Casanova's work history, medical record and claimed limitations as they related to the relevant period (R. 46-91). Ms. Casanova testified that she retired from her company in 2004 as a result of downsizing and that she accepted a benefits package (R. 54). In describing her previous work experience, Ms. Casanova stated that she substituted as a lab technician for a period of approximately one year while the regular employee was out on medical leave (R. 52). She described the position as one that allowed her to sit or stand near the lab table and to lift only a weight of three pounds (R. 54). When the regular employee returned, Ms. Casanova explained that she was not offered her original position as a production supervisor because the company was reducing its manpower (*Id.*). She stated that she did not believe that she would be offered a position as a lab technician because she did not meet the minimum qualifications, did not have a background in quality control and was not a chemist (R. 52-53, 80-82).

After she left her company, Ms. Casanova worked occasionally as a Spanish language translator for a school district and continued to look for work similar to her previous position until 2006, at which time she began to experience knee and back pain and discontinued her search (R. 56). Ms. Casanova stated that, during her search for work, she likely would have

accepted a position with similar requirements as her previous production supervisor position (R. 88). Her employment search also included retail jobs and work in other industries (R. 56).

Ms. Casanova testified that she treated her pain with over-the-counter medication, such as Advil, and continued exercises as prescribed by her physical therapist (R. 58-59). Ms. Casanova stated that she did not do any household chores, did not cook, did not go upstairs in her two-story home, did not go shopping and rarely left the house (R. 61-63). She further testified that she did not visit with anyone unless they came to her home and sat with her (R. 64-65). Ms. Casanova stated that she did almost nothing during the relevant period, and did not have pets or any hobbies (*Id.*). Although she testified that she did not drive, she was able to drive herself to the hearing before the ALJ (R. 69-70). Ms. Casanova did attest to a single visit to Mexico for three days to attend a funeral in 2005 (R. 77-79).[7]

Ms. Casanova stated that her doctor recommended that she get partial replacements in both knees in 2006, but that Dr. Sauer, her current doctor, treats her with injections (R. 71); however, Ms. Casanova also testified that no doctor had stated that she needed surgery (R. 73).[8] Describing her neck, shoulder, and arm pain, Ms. Casanova stated that she cannot turn her neck from side to side without experiencing pain, but that she has not sought treatment because "it's not painful as long as [she doesn't] turn" her head (R. 56-57, 73-74). She stated that she experienced pain in her right arm for about six months that dissipated with the use of ibuprofen, a heating pad, ice and a sling (R. 73-74).

---

[7]Ms. Casanova stated that she visited Mexico when her parents and grandmother passed away. She also stated, somewhat confusingly, that her mother died in 2005 and that she only visited Mexico a single time between 2004 and 2008 when her grandmother died (R. 77-78). The ALJ did not seek clarification as to whether it was Ms. Casanova's mother or grandmother who passed away during that period.

[8]Ms. Casanova did not state which doctor recommended knee replacements (R. 71). There is no medical record documenting such a recommendation; indeed, the record does not include any medical records between 2006 and 2008. *See also supra* text accompanying note 5.

Ms. Casanova reported that she was diabetic and that she controlled her condition through intermittent medication, adjusted dieting and occasional monitoring (R. 66-67). She confirmed that she had never been hospitalized for any situation related to diabetes (*Id.*). Ms. Casanova stopped monitoring her blood sugar because the testing strips were too expensive (*Id.*). She modified her diet and occasionally took medication to control her high blood pressure until she was instructed in 2006 that she did not have to take the medication regularly (R. 68). She did not claim any limitation as a result of either her diabetes or her high blood pressure during the period before her DLI.

### D.

Vocational expert ("VE") Pamela Tucker testified next that Ms. Casanova's work as a production supervisor and lab technician were both "light, skilled" positions under the Dictionary of Occupational Titles ("DOT") standards, but that the production supervisor position as Ms. Casanova performed it qualified as "heavy" work (R. 89). The ALJ presented the VE with a scenario based upon a hypothetical worker who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk six hours in an eight hour day; could sit for six hours; could occasionally climb ramps and stairs but could not climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently reach from waist to chest and occasionally reach above the shoulder level; and should not perform repetitive movements with the neck or side-to-side twisting (*Id.*). The VE stated that the hypothetical worker could perform both the positions of lab technician and production supervisor as normally performed in the national economy (R. 90). The VE continued to state that the hypothetical worker could not perform the production supervisor position in the manner that Ms. Casanova performed it (*Id.*). The ALJ then added a requirement that the hypothetical worker

have a sit/stand option at 30-minute intervals and asked if this worker would then be able to perform Ms. Casanova's previous positions (R. 90). The VE testified that the hypothetical worker would then be able to perform both the production supervisor and lab technician positions, as defined by the DOT, but not the production supervisor position as performed (*Id.*).

Ms. Casanova raised no objections to the VE's qualifications or testimony. Her attorney presented no cross-examination. The ALJ then closed the hearing.

## E.

In her nine-page opinion, the ALJ found that Ms. Casanova was not disabled at any point between the alleged onset date, December 1, 2004, and the DLI, December 31, 2008 (R. 31-39). The ALJ applied the five-step sequential process to determine whether Ms. Casanova was disabled during the relevant period (R. 32). The five-step process, outlined in 20 C.F.R. 404.1520(a)(4), requires that the ALJ analyze whether the claimant: (1) engaged in substantial gainful activity; (2) has a medically determinable impairment or combination of impairments that is "severe" and significantly limits the individual's ability to perform basic work activities; (3) has an impairment or combination of impairments that meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) has the RFC to perform the requirements of her past relevant work; and (5) has the RFC to perform any other work given her age, education and work experience. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the claimant does not have an impairment that meets or equals one of the listed impairments at Step 3, the ALJ must assess and make a finding about the claimant's RFC before completing Steps 4 and 5. *See* 20 C.F.R. § 404.1420(e). The claimant bears the burden of proof at every step except Step 5, where the Commissioner must prove that the claimant can perform work available in the national economy. *See Weatherbee v. Astrue*, 649

F.3d 565, 569 (7th Cir. 2011). Additionally, the claimant must meet the insured status requirements of section 216(i) and 223 of the Social Security Act (R. 31).

At Step 1, the ALJ found that Ms. Casanova had not engaged in substantial gainful activity during the relevant period (R. 33). At Step 2, the ALJ determined that Ms. Casanova's degenerative disc disease, osteoarthritis, obesity, and diabetes mellitus were "severe" impairments (*Id.*). At Step 3, the ALJ found that Ms. Casanova's impairments did not meet or medically equal any of the listed impairments (R. 34). The ALJ then evaluated Ms. Casanova's RFC, finding that she could perform light work as defined in 20 C.F.R 404.1567(b), except that she required a sit/stand option at 30 minute intervals (R. 35). At Step 4, the ALJ found that given this RFC, Ms. Casanova could perform her past work as a production supervisor as the job is generally performed, and her past work as a lab technician both as that job is generally performed and as she actually performed it (R. 38-39). The ALJ's analysis did not continue on to Step 5 because the ALJ deemed Ms. Casanova able to perform her past relevant work (R. 33).

### III.

This court reviews the ALJ's decision to determine whether it is supported by substantial evidence and includes sufficient detail for review. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citations omitted). This standard requires that the ALJ build a logical bridge between the evidence and her decision. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In determining whether the ALJ's decision has sufficient support, this Court will not substitute its opinion for the ALJ's or reweigh the evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Casanova raises four arguments in support of her request to reverse the ALJ's decision and remand the case for further proceedings. *First*, she argues that the ALJ failed to properly analyze her RFC. *Second*, she contends that the ALJ's decision failed to determine the disability onset date. *Third*, Ms. Casanova asserts that the ALJ failed to properly assess her past relevant work. *Fourth*, she argues that the ALJ erred in her credibility analysis. For the reasons set forth below, the Court disagrees with each of these challenges.

## A.

The ALJ found that Ms. Casanova is able to perform light work subject to a sit/stand modification that allows her to alternate her body position every 30 minutes, with the further restrictions of only occasional climbing of ramps and stairs and reaching above the shoulder level, no repetitive twisting or side-to side movements of the neck, and frequent reaching from waist to chest (R. 35). Ms. Casanova now argues that the ALJ erred in determining her RFC.[9] Specifically, she maintains that the ALJ erred in finding that she has the ability to stand and walk for six hours out of an eight-hour work day. She further contends that the ALJ did not evaluate medical evidence establishing her inability to work or stand for six hours a day; did not follow the dictates of Social Security Ruling 96-8; and did not rely on physician opinion evidence in determining functional capacity (Pl.'s Br. at 5-8). We disagree.

The RFC determination represents the maximum Ms. Casanova can do, despite her limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *See Pepper*, 712 F.3d at 362; *see also* SSR 96-8p, 1996 WL 374184 at *1 (July 2,

---

[9]Ms. Casanova points out that, given her age (in excess of 50 years old), a finding that she cannot perform light work would result in a finding of disability. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.10 (calling for a finding of disability when a claimant is older than 50, cannot perform her past relevant work and is limited to sedentary work).

1996). The ALJ was only obligated to include in her RFC those limitations that were supported by medical evidence in the record, and that she found credible. *See Young v. Barnhart,* 362 F.3d 995, 1003 (7th Cir. 2004); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007). Here, the ALJ determined that Ms. Casanova has the capacity to perform light work subject to a sit/stand modification, and she based this conclusion on numerous entries in the medical record, including: a 2004 x-ray of the right knee showing only mild arthritic changes; a "relatively benign MRI" of her spine; an absence of complaints of "incapacitating pain" in the medical record (including a self-reported pain level of 0/10 to physical therapist Sue Miller); a normal gait with no assistive device; a good response to physical therapy treatments; a nearly four-year gap in medical treatment; the failure to return for follow-up appointments with various orthopedic specialists in the event she experienced continued pain; and the absence of any medical records showing medical treatment for diabetes.

In discussing this evidence, the ALJ first reviewed the chronology of Ms. Casanova's medical records and noted "none of the office notes suggests incapacitating pain" (R. 36). The ALJ referred to Ms. Casanova's physical therapy session where she claimed 0/10 pain unless she bends to lift something from the floor, as well as Dr. Walsh's recommendation to continue to treat any pain with Advil and Vioxx. Additionally, the ALJ relied on the medical records in noting that Ms. Casanova "required no assistive device, her gait was normal, and her radiologic findings and physical examinations were relatively benign with only minor abnormalities" (R. 37). The ALJ also noted that Ms. Casanova's physical therapist reported "poor compliance with home exercise" in her medical report to Dr. Kim. Taken together, the ALJ provided a lengthy narrative of Ms. Casanova's testimony, medical records and claimed symptoms. *See Knox v. Astrue*, 327 Fed. App'x 652, 657 (7th Cir. 2009) (finding that "the expression of a claimant's

12

RFC need not be articulated function-by-function [per SSR 96-8p]; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient"). We find that the ALJ discussed in sufficient detail the medical evidence she replied upon in arriving at Ms. Casanova's RFC and thus built a logical bridge from the evidence to her conclusion. *McKinzey v. Astrue,* 641 F.3d at 889.

An ALJ will also engage in a credibility analysis when, as here, the alleged symptoms lack objective medical evidence. *See Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003). In so doing, the ALJ follows a two-step process in assessing a claimant's credibility as to allegations of pain. *See* SSR 96–7p, 1996 WL 374186 (July 2, 1996). *First*, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected produce the individual's pain or other symptoms." *Id.* at *2. *Second*, once an underlying physical or mental impairment is established and the impairment could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* In evaluating a claimant's symptoms, the ALJ considers factors cited in the Social Security regulations, including the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any measures used to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii) (setting forth factors relevant to evaluating a claimant's symptoms of pain).

Here, the ALJ found that Ms. Casanova's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but then found that her statements regarding the intensity, persistence and limiting effects of those symptoms were not credible (R. 36). The ALJ noted inconsistencies between Ms. Casanova's testimony at the hearing and the medical records reflecting what she reported to the physicians at the time they treated her. The ALJ noted that although Ms. Casanova reported the onset date of her disability as the date she was laid off from her work at the chemical company, at the hearing Ms. Casanova testified that her employment at that job ended not because of any alleged disability, but because she was laid off from work on that date and accepted a benefits package in return (R. 38).

Further undermining Ms. Casanova's allegations of limiting pain as of December 2004 is the fact that she continued to look for work similar to her prior employment through 2006—well after the alleged onset of disability (R. 38). The ALJ also noted that Ms. Casanova contradicted her statements as to why she did not seek treatment, stating first that it was because she had no insurance, but then subsequently suggesting that she discontinued treatment because her initial back injury had healed over time (R. 37).[10] Ms. Casanova further testified at the hearing that her medical conditions rendered her incapable of virtually all daily activity; however, during the same period, none of the medical opinions included any reports of significant, chronic pain. To the contrary, despite her testimony regarding the debilitating effect of her pain, Ms. Casanova's own physician, Dr. Walsh, recommended that she continue to treat the pain with over-the-counter medications such as Vioxx unless she experienced worsening symptoms. The ALJ properly considered these discrepancies in her opinion and concluded that Ms. Casanova's

---

[10]During the hearing, the ALJ questioned Ms. Casanova about her visit to Dr. Templin in February 2010, to whom she reported that she had a previous back injury that had healed over a number of months, and that her current low back pain began in October 2009—after her DLI. Ms. Casanova confirmed this characterization in her hearing testimony (R. 76-77).

claims of extreme limitations were not credible. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."). We find no sound basis upon which to conclude that the ALJ's determinations were "patently wrong" and subject to reversal. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013).

Ms. Casanova makes a few additional arguments to attempt to show that the RFC was erroneous, none of which advances her challenge. She asserts that the ALJ offered no analysis of her diabetes. However, we find that the ALJ addressed Ms. Casanova's diabetes when she noted that Ms. Casanova did not take medication for her diabetes, monitored her sugar levels only intermittently and had never required emergency care for this condition (R. 37). While Ms. Casanova contends that she testified as to "sky high" sugar readings, the medical record does not support this allegation.[11] The ALJ specifically noted that there was no history of hospitalization involving this disease. We are aware of Dr. Kalmar's statement in October 2005, when treating Ms. Casanova for a stubbed toe, about the importance of foot care after Ms. Casanova reported being diabetic (R. 318). At that time, however, Dr. Kalmar also reported that Ms. Casanova was at "very low" risk for any complications related to diabetes (*Id.*). There was no indication in the record that Ms. Casanova's diabetes created any limiting effect on her ability to function in the workplace.

---

[11]Ms. Casanova provided two blood tests performed prior to her DLI. The first, dated July 31, 2004, indicates that her Hemoglobin A1c count of 6.8 was within the "treatment goal of <7.0% for diabetic patients" (R. 304). The second, dated March 23, 2005, indicated a Hemoglobin count of 7.3, which was just outside of the desired range for diabetic patients (R. 301). Ms. Casanova provided additional blood tests that reflected much higher Hemoglobin A1c counts of 12.9% in January 2010 and 11.7% in October 2010 (R. 353, 421-422); however, these tests were performed after the relevant period. Additionally, Ms. Casanova's medical record includes only a single glucose reading (before her DLI) of 129 in July 2004—only somewhat above the suggested range of 65-99 (R. 304). This is compared with Ms. Casanova's 2010 blood tests, where her glucose was measured at 305 in March and 279 in August—arguably, "sky high" numbers (R. 304, 350, 421-22).

Ms. Casanova also complains that the ALJ (a) failed to mention Dr. Walsh's conclusion that Ms. Casanova had severe walking limitations, and (b) generally neglected to rely on any physician opinion evidence (Pl.'s Br. at 7-8). An ALJ's discussion "need not contain a complete written record of every piece of evidence." *McKinzey v. Astrue*, 641 F.3d at 891. The ALJ addressed the findings of all of the medical experts in the record, including those of the State Agency doctors who found insufficient evidence to determine disability (R. 38).

Finally, contrary to Ms. Casanova's contention, we find no evidentiary deficit for the ALJ's determination of the RFC for the period from Ms. Casanova's alleged onset date to her DLI of December 31, 2008. An ALJ does have a duty to develop a claimant's medical record and may be required to consult medical advisors where that record appears to be incomplete. 20 C.F.R. § 416.912(d) (2000); *Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir. 1999); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that an ALJ needs only recontact medical sources when the evidence of record is inadequate to determine whether the claimant is disabled). The ALJ has the discretion to determine how much medical evidence she needs to make a disability determination. Moreover, the primary responsibility for supplying medical evidence supporting the severity of impairments rests with the claimant, who in this case was represented by counsel in the administrative proceedings. 20 C.F.R. § 416.912(c) (2000). We presume that a claimant represented before the ALJ has presented her "best case." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Plaintiff points out (Pl.'s Br. at 9) that both State Agency doctors stated that there was "insufficient evidence" in the medical record to determine Ms. Casanova's condition prior to December 31, 2008 (*see* R. 405, 441). However, even though the ALJ must consider the consultants' opinions, she was not bound by those opinions on that subject. *McKinzey v. Astrue*,

641 F.3d at 891. Under SSR 96-5p and 96-6p, the agency consultants' opinions are just one of many factors an ALJ considers in determining an RFC and the question of disability. *See* SSR 96-6p (1996) ("[consultants' opinions] are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence"). Here, the ALJ provided a reasoned explanation as to why she had sufficient information to determine Ms. Casanova's RFC prior to her DLI of December 31, 2008 (R. 38). That explanation shows that there was sufficient medical (and other) evidence to conclude that Ms. Casanova's conditions during that period were not disabling. We find the ALJ's conclusion was supported by substantial evidence.

## B.

Ms. Casanova also contends that the ALJ was required to determine the onset date of her disability, and erred by failing to do so. We disagree. The Seventh Circuit has held that when an ALJ finds that a claimant is not disabled prior to her DLI, "there [is] no need to determine an onset date." *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008); *see also* SSR 83-20, at *1 ("[a] title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)"). In this case, the ALJ considered the entire record as it pertained to the relevant period and determined that Ms. Casanova was not disabled as of her DLI. Nothing more was required.

We recognize that prior to the hearing before the ALJ, the agency had determined that Ms. Casanova was disabled (and entitled to SSI benefits) as of January 11, 2010, after her DLI, based on her various conditions as they then existed and because someone of her age who is limited to sedentary work is deemed disabled (R. 93, 220). However, as we have explained, the ALJ found that Ms. Casanova was not entitled to DIB because she was not disabled as of her DLI of December 31, 2008. Having made that finding, the ALJ had no occasion to consider at

what point after December 31, 2008 Ms. Casanova was disabled, because any such finding would be irrelevant to the question before the ALJ: that is, whether Ms. Casanova was disabled *prior* to January 1, 2009, and thus entitled to DIB.

Moreover, as is evident in the discussion in Section A, above, in explaining her finding that Ms. Casanova was not disabled, the ALJ's analysis embraced the factors that an ALJ must consider under SSR 83-20 in determining an onset date: (1) the claimant's alleged onset date; (2) the claimant's work history; and (3) medical and all other relevant evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005). The ALJ began her analysis by defining the relevant period for Title II DIB claims. The ALJ considered Ms. Casanova's work history, her reasons for leaving her last full time job, her continued search for work even after her alleged onset date and Ms. Casanova's own statement that she likely would have accepted a position similar to her previous position had she been offered the job during her search for employment. The ALJ also considered the entire medical record and Ms. Casanova's testimony.

At bottom, Ms. Casanova's true quarrel with the ALJ is not that she failed to fix a date of disability, but rather that the ALJ found that Ms. Casanova was not disabled at any time prior to the DLI. As we have already explained, that finding is supported by substantial evidence. The ALJ did not err by failing to undertake the unnecessary task of trying to determine a post-DLI onset date.

## C.

Ms. Casanova's contention that the ALJ erred in assessing whether she could perform her past relevant work is premised on *Smith v. Barnhart*, 388 F.3d 251 (7th Cir. 2004). However, her reliance on this decision is misplaced. In *Smith*, the appeals court held that the ALJ erred in determining that the claimant was able to perform sedentary work without evaluating the

claimant's past relevant work experience to determine if the various jobs could be performed by one who is limited to sedentary work. *Id.* at 252.

In this case, the ALJ did not commit the same error. She evaluated whether Ms. Casanova could perform her past relevant work as a production supervisor, or alternatively, her position as a lab technician. After determining Ms. Casanova's RFC, the ALJ relied on Ms. Casanova's and the VE's hearing testimony to assess whether Ms. Casanova could perform her past relevant work. *See Stark v. Astrue*, 278 F.App'x 661, 667 (7th Cir. 2008) (in comparing the duties required for a claimant's past relevant work, the ALJ is entitled to rely on the VE's testimony in the absence of any apparent conflicts). The ALJ found that Ms. Casanova could perform her position as a production supervisor as performed generally in the economy, or a position as a lab technician as the job is generally performed and as Ms. Casanova actually performed it. To reach this conclusion, the ALJ presented the VE with a hypothetical worker burdened with the same functional limitations as Ms. Casanova's RFC. The ALJ then asked the VE if the hypothetical worker would be able to perform the positions of production supervisor and lab technician. The ALJ further relied on Ms. Casanova's own statements that she would have been able to perform in her position as a lab technician, if she were offered a similar position.

Indeed, by her own testimony, Ms. Casanova worked temporarily as a lab technician filling in for an employee who was on medical leave for one year. In doing so, Ms. Casanova filled the position long enough to satisfy the temporal requirement that the job be performed long enough to learn how to do it. *See* 20 C.F.R. § 404.1565(a) ("We consider that your work experience applies when it . . . lasted long enough for you to learn to do it"). Where a claimant "is physically capable of doing the type of work she has done in the past (whether or not she

could actually find a job today), she cannot be found to be disabled." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984); 20 C.F.R. § 404.1560(b).

We find no error in the ALJ's assessment of Ms. Casanova's ability to perform her past relevant work.

## D.

Finally, Ms. Casanova argues that the ALJ erred in assessing the credibility of her subjective statements as to the intensity, persistence, and limiting effects of her symptoms. The central issue, then, is whether the ALJ offered sound reasons based in evidence to explain her finding that Ms. Casanova lacked credibility. *See Skarbek v. Barnhart*, 390 F.3d at 504-05. This Court will not substitute its judgment for the ALJ's unless the assessment is "patently wrong." *Id.*

The ALJ considered the medical record and Ms. Casanova's testimony in evaluating her credibility and explained her reasons for discounting those statements she found to be not credible. The credibility of Ms. Casanova's statements was previously addressed in this opinion, *see* pp. 13-15, above, and need not be repeated. The ALJ is responsible for making the determination of credibility and that decision is entitled to deference. *Skarbek*, 390 F.3d at 504-05. The ALJ provided sufficient reasons for finding that Ms. Casanova's statements lacked credibility, including testimony demonstrating that Ms. Casanova continued to look for employment during the period that she claims she was disabled. For the preceding reasons, we find that the ALJ's credibility assessment was not patently wrong.[12]

---

[12]Ms. Casanova also complains about the ALJ's use of the oft-criticized boilerplate language in her credibility analysis. However, the Seventh Circuit has made it clear that an ALJ's use of that boilerplate language does not amount to reversible error if the ALJ "otherwise points to information that justifies his credibility determination." *See Pepper*, 712 F.3d at 367-68. Put another way, there is no basis to reverse based on an ALJ's

# CONCLUSION

For the reasons stated above, we deny Ms. Casanova's motion to reverse and remand the ALJ's decision (doc. # 22), and grant the defendant's motion (doc. # 23) to affirm the Commissioner's decision denying DIB. The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: July 30, 2014**

---

use of this boilerplate where she gave other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). The ALJ did so here.